UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

———————————————————

WILLIAM GRINNELL, FRANK
SHELDON , and DANIEL BLANCHETTE,
SR.,

               Plaintiffs,

v.

UNITES STATES ENVIRONMENTAL
PROTECTION AGENCY, NEW YORK
STATE DEPARTMENT OF HEALTH, and
TOWN OF TICONDEROGA, New York,

               Defendants.

———————————————————

**COMPLAINT**

Case No.  8:23-cv-01265 (GLS/CFH)

William Grinnell, Frank Sheldon, and Daniel Blanchette, Sr. ("Plaintiffs"), by and

through their undersigned attorneys, Young Sommer, LLC, allege and state as follows as and for

their citizen's suit complaint filed herein pursuant to 42 U.S.C. § 300j-8:

**NATURE OF THE ACTION**

1.     Plaintiffs bring this citizen's suit in this Court pursuant to Section 1414(b) of the

federal Safe Drinking Water Act ("SDWA"), 42 U.S.C. §§ 300g-3(b), 300j-8(a). Plaintiffs reside

in the Town of Ticonderoga ("Town") with their family homes connected to and/or served by the

Town's municipal water system, and who on a daily basis consume drinking water the Town

supplies to them at a cost, and/or who have recently been or are under imminent threat to be

disconnected from such municipal water system due to the Town's ongoing noncompliance with

the SDWA, and, more specifically, the terms of the consent decree entered in April 2018 in the

1

case styled, *United States, et al. v. Town of Ticonderoga*, NY, 18-cv-442 (GLS/CFH) (NDNY 2018).[1]

2.      The SDWA requires public water systems such as those operated in Ticonderoga to monitor their water supplies to ensure compliance with drinking water regulations and to report monitoring results to New York State Department of Health ("NYSDOH"), must then review monitoring data submitted by public water systems, and conduct their own monitoring, to determine system compliance with mandatory drinking water regulations.[2] The United Staes Environmental Protection Agency ("USEPA") monitors public water system compliance primarily by reviewing data submitted by the states.

3.      Section 1414 of the SDWA also requires that, whenever USEPA finds that a public water system in a state with primary enforcement authority (such as New York) does not comply with regulations, the agency must notify the state and the system and aid in bringing the system into compliance. If the state fails to commence enforcement action within 30 days after the notification, EPA is authorized to issue an administrative order or commence a civil action.

4.      To date, the Consent Decree has been wholly ineffective at resolving the Town's clear and ongoing violations of the SDWA, and neither the USEPA nor its delegate NYSDOH is actively enforcing the Consent Decree's  terms and/or requirements, imposed to cure the Town's multiple violations of the SDWA.

5.      The Town remains (now five years after this Court approved the Consent Decree) in violation of federal law, and the USEPA (and NYSDOH's) prosecution of the Consent Decree and oversight of the Town's implementation of its mandatory terms has been nonexistent, all to the detriment of Plaintiffs in the form of either or both of an inadequate or unsafe new drinking

---

[1] A true and correct copy of the Consent Decree is annexed hereto as **<u>Exhibit 1</u>**.
[2] NYSDOH has assumed primacy over and is therefore stands in USEPA's shoes under the statute as the agency principally responsible for implementing the SDWA's mandatory, nondiscretionary, requirements and terms, pursuant to Section 1413 of the SDWA, 42 U.S.C. §300g-2.

water system, or, remarkably -- in the year 2023 in a town of nearly 5,000 residents adjacent to Lake Champlain, one of the Nation's cleanest, most pristine large lakes -- facing a future with no municipally-owned residential drinking water source or supply at all.

6.     These many Ticonderoga residents, who have enjoyed municipal water for decades, including certain Plaintiffs here, will be left to fend for themselves from n ow on vis-à-vis home drinking water. And must do so in a challenging water supply environment where the Town (and NYSDOH and USEPA) have already failed to accomplish that goal.

7.     Section 1449(a) of the SDWA, 42 U.S.C. §300j-8, allows citizens to file a civil action against any federal agency (here, the USEPA) that is alleged to be in violation of any SDWA requirement. In addition, SDWA subsection 1449(a) allows citizens to file a civil action against the EPA Administrator for an alleged failure to perform any non-discretionary act or duty, such as enforcing the SDWA' s rules against recalcitrant Towns and treatment works.

## JURISDICTION

8.     Jurisdiction in this Court lies pursuant to 28 U.S.C. § 1331 (federal question), and pursuant to the express grant of jurisdiction over SDWA citizen's suits provided by 42 U.S.C. § 300j-8, which states, in pertinent part:

> **(a) Persons subject to civil action; jurisdiction of enforcement proceedings**
>
> Except as provided in subsection (b) of this section, any person may commence a civil action on his own behalf-
> (1) against any person (including (A) the United States, and (B) any other governmental instrumentality or agency to the extent permitted by the eleventh amendment to the Constitution) who is alleged to be in violation of any requirement prescribed by or under this subchapter;
> (2) against the Administrator where there is alleged a failure of the Administrator to perform any act or duty under this subchapter which is not discretionary with the Administrator; or
> (3) for the collection of a penalty by the United States Government (and associated costs and interest) against any Federal agency that fails, by the date that is 18 months after the effective date of a final order to pay a

3

penalty assessed by the Administrator under section 300h–8(b) [1] of this title, to pay the penalty.

* * * The United States district courts shall have jurisdiction, without regard to the amount in controversy or the citizenship of the parties, to enforce in an action brought under this subsection any requirement prescribed by or under this subchapter or to order the Administrator to perform an act or duty described in paragraph (2), as the case may be.

9.      SDWA subsection 1449(b) precludes citizens from filing a civil action if USEPA, the Department of Justice, or a state has filed and is diligently prosecuting a civil action. In addition, SDWA subsection 1449(b) precludes citizens from filing a suit until notification is given to USEPA, the State in which the alleged violation occurred, and the facility alleged to be in violation of a SDWA requirement, and at least sixty (60) days has passed since that notification.

10.     Plaintiffs has complied with all the SDWA's prior notice requirements and other preconditions, including  through the correspondence, a/k/a/ "60-Day Notice Letter," annexed hereto as **Exhibit 2**.

11.     As of the date of this filing, more than 60-days later, neither USEPA nor the Town (nor NYSDOH) has replied to, acted upon, acknowledged, or otherwise taken any steps to enforce the Consent Decree or required the Town to comply with the SDWA. On the contrary, the Town continues to spend taxpayer monies on a plan that is now long-overdue, outdated, inadequate as to capacity and treatment, and which, overall, fails to comply with the Act.

12.     Annexed hereto as **Exhibit 3** is the notice from the Town dated December 19, 2022, notifying residents, including two of these Plaintiffs, that they were poised to be disconnected and kicked-off the municipal water supply forever.

## PARTIES

13.     William Grinnell is an individual who resides at 17 Grace Avenue, Ticonderoga, Essex County, New York 12883, and is served by the Town's municipal drinking water system. The Grinnell residence is subject to being disconnected from its existing drinking water supply and re-connected to the as-yet-constructed, seemingly inadequate and unsafe proposed new supply.

14.     Frank Sheldon is an individual who resides at 58 Cossey Street, Ticonderoga, Essex County, New York 12883, and is currently served by the Town's municipal drinking water system. The Sheldon residence will be disconnected from the Town's water supply under the current plan, and the Sheldon family will be required to bear the cost and expense of locating, developing, and maintaining a new water supply.

15.     Daniel Blanchette, Sr. is an individual who resides at 134 Old Chilson Road, Ticonderoga, Essex County, New York 12883, and is served by the Town's municipal drinking water system. The Blanchette residence will be disconnected from the Town's water supply under the current plan, and the Blanchette family will be required to bear the cost and expense of finding, developing, and maintaining a new water supply.

16.     The United States Environmental Protection Agency is an executive agency of the United States Government, with a principal place of business located at 1200 Pennsylvania Avenue NW, Washington, D.C. 20460, and with its Region 2 headquarters (covering, *inter alia*, Ticonderoga) located at Ted Weiss Fed. Bldg., 290 Broadway, New York, New York 10007.

17.     The New York State Department of Health is an executive agency of the state of New York, with a principal place of business located at Corning Tower, Empire State Plaza, Albany, Albany County, New York 12237.  Upon information and belief, USEPA has delegated

state primacy to NYSDOH with respect to administration and enforcement of the SDWA, pursuant to Section 1413 of the SDWA, 42 U.S.C. § 300g-2 and 40 CFR Part 142, subpart B.

18.    The Town of Ticonderoga is a political subdivision of the state of New York, with a principal place of business located at 132 Montcalm Street, Town of Ticonderoga, Essex County, State of New York 12883. Ticonderoga is the owner and operator of the municipal water systems at issue and those to be replaced and/or discontinued. The Town is an incorporated town formed under the laws of New York, and located in Essex County. The Town is a "municipality" within the meaning of Section 1401(10) of SDWA, 42 U.S.C § 300f(10). The Town is a "person" within the meaning of Section 1401(12) of SDWA, 42 U.S.C. § 300f(12).

## VENUE

19.    Venue is appropriate in the United States District Court for the Northern District of New York pursuant to 28 U.S.C. § 1391(a) and (b)(2).

## THE PREVAILING STATUTORY SCHEME

*The Safe Drinking Water Act*

20.    Section 1401(4) of the SDWA, 42 U.S.C. § 300f(4), and 40 C.F.R. § 141 2, define a "public water system" as a "system for the provision to the public of water for human consumption through pipes or other constructed conveyances, if such system has at least fifteen service connections or regularly serves at least twenty-five individuals." A "supplier of water" is defined at Section 1401(5) of the SDWA, 42 U .S.C. §300f(5), and 40 C.F.R. § 141.2, as "any person who owns or operates a public water system."

21.    The Town of Ticonderoga operates a "public water system" within the meaning of the SDWA.

22.    Public water systems must comply with the National Primary Drinking Water Regulations promulgated under Part B of the SDWA, 42 U.S.C. § 300g-300g-6, except to the

extent that an exception, variance, or exemption under Section 1411, 1415, or 1416, 42 U .S.C. §§ 300g, 300g-4, or 300g-5, is applicable. SDWA Section 1411, 42. U.S.C. § 300g.

23.    The Town of Ticonderoga has received no such variance or exemption from the SDWA's mandatory terms.

*The Enhanced Treatment Rule*

24.    The National Primary Drinking Water Regulations include the Long Term 2 Enhanced Surface Water Treatment Rule, hereinafter "Enhanced Treatment Rule." 40 C.F.R. § 141.700(a). EPA promulgated the Enhanced Treatment Rule on January 5, 2006. See 71 Fed. Reg. 654 (January 5, 2006). The Enhanced Treatment Rule applies to public water systems supplied by a surface water source. 40 C.F.R. § 141.700(b).

EPA described the purpose of the Enhanced Treatment Rule at its publication:

EPA is promulgating the Long Term 2 Enhanced Surface Water Treatment Rule to further protect public health against *Cryptosporidium* and other microbial pathogens in drinking water. *Cryptosporidium* is a protozoan parasite that is common in surface water used as drinking water sources by public water systems. In drinking water, *Cryptosporidium* is a particular concern because it is highly resistant to chemical disinfectants like chlorine. When ingested, *Cryptosporidium* can cause acute gastrointestinal illness, which may be severe and sometimes fatal for people with weakened immune systems. *Cryptosporidium* has been identified as the cause of a number of waterborne disease outbreaks in the United States.

71 Fed. Reg. 654 (January 5, 2006) (parenthetical references omitted).

25.    The Enhanced Treatment Rule requires public water systems that receive water from an unfiltered surface water source (again, like the Town, which had long used Gooseneck Pond) to provide at least 2-log Cryptosporidium inactivation, *i.e.*, treatment that inactivates 99% of the existing number of Cryptosporidium bacteria, and potentially higher levels of inactivation depending on the current Cryptosporidium levels in the water source. 40 C.F.R. § 141.712.

26.    The Enhanced Treatment Rule requires unfiltered public water systems serving fewer than 10,000 people to achieve the required Cryptosporidium treatment by October 1, 2014. 40 C.F.R. § 141.713.

27.    The Enhanced Treatment Rule also requires public water systems using uncovered finished water storage facilities to cover the water storage facility, or treat the water discharged from the uncovered finished water storage facility to the distribution system in order to achieve inactivation and/or removal of at least 4-log virus, 3-log Giardia lamblia, and 2-log Cryptosporidium by April 1, 2009, or to be in compliance with a state-approved schedule to meet these conditions no later than April 1, 2009. 40 C.F.R. § 141.714.

*The New York Public Health Law*

28.    New York Public Health Law § 1100 authorizes the NYSDOH to promulgate regulations to protect public water supplies from contamination.

29.    New York Public Health Law § 1102 provides that if a public water system is in violation of regulations promulgated pursuant to § 1100, and the water system does not come into compliance after receiving notice of the violation, New York may file an action for penalties and an injunction restraining the public water system from further violations. New York Public Health Law § 1103 provides that a public health system in violation of regulations promulgated pursuant to § 1100 is subject to civil penalties of up $200 per violation, per day of violation.

*The New York State Sanitary Code*

30.    Pursuant to § 1100 of the New York Public Health Law, the NYSDOH promulgated § 5-1.30 of the New York State Sanitary Code to establish treatment requirements for public water systems. The State Sanitary Code definition of public water system includes community water systems that provide water to the public for human consumption through pipes that serve at least 25 individuals daily at least 60 days out of the year. 10 NYCRR 5-l.l(be).

8

31.     For public water systems using an unfiltered surface water source, as a condition of continuing to avoid filtering water provided to users, the State Sanitary Code requires disinfection sufficient to ensure at least 99.9 percent inactivation of Giardia lamblia cysts and 99.99 percent inactivation of viruses, between a point where the raw water is no longer subject to recontamination by surface water runoff and a point downstream before or at the first consumer. 10 NYCRR 5-1.30(c)(3).

32.     For public water systems using an unfiltered surface water source, as a condition of continuing to avoid filtering water provided to users, the State Sanitary Code requires that the disinfection system have redundant components to ensure continuous disinfection, and requires that auxiliary power with automatic start and alarm is provided at all disinfection facilities where a power outage would result in a loss or reduction in the ability of the system to maintain the required disinfection concentration. 10 NYCRR 5-1.30(c)(4).

*Filtration Avoidance Determination*

33.     Public water systems must filter all water from a surface water source that is not subject to a current Filtration Avoidance Determination. 10 NYCRR 5-1.30(b).

34.     In 1991, New York granted Ticonderoga a Filtration Avoidance Determination for Gooseneck Pond, which allowed Ticonderoga to distribute water from Gooseneck Pond to its users without filtering the water.

35.     One condition of the Filtration Avoidance Determination was that Ticonderoga install a redundant chlorination system at its Gooseneck Pond Chlorination Station. Another condition of the Filtration Avoidance Determination was that Ticonderoga evaluate its distribution system to ensure that users directly upstream from the Gooseneck Pond Chlorination Station were receiving water that had been exposed to the required chlorine contact time.

36.     Ticonderoga operates a "public water system" within the meaning of Section 1401(4) of the SDWA, 42 U.S.C. § 300f(4), 40 C.F.R. § 141.2, and 10 NYCRR 5-l .l(be). Ticonderoga is a "supplier of water" within the meaning of Section 1401(5) of the SDWA, 42 U.S.C §300f(5), 40 C.F.R. § 141.2, and 10 NYCRR 5-1.1(bu). Ticonderoga must comply with all National Primary Drinking Water Regulations promulgated under Part B of the SDWA. None of the exceptions in Section 1411, 42 U.S.C. §300g are applicable.

37.     The correspondence annexed hereto as **Exhibit 2** notified the Defendants that William  Grinnell, Frank Sheldon and Daniel Blanchette Sr., as residents of the Town connected to and/or served by the Town's municipal water system and who on a daily basis consume drinking water the Town supplies to them at a cost, and/or who have recently been or are under imminent threat to be disconnected from such municipal water system, intend to commence a civil action against the Town, the New York State Department of Health ("DOH"), and the United States Environmental Protection Agency ("EPA"), pursuant to Section 1414(b) of the *Safe Drinking Water Act* ("SDWA"), 42 U.S.C. S§ 300g-3(b), 300j-8(a) and Section 5-1.30 of the New York State Sanitary Code, seeking monetary penalties for these violations as well as injunctive relief compelling Ticonderoga to come into compliance with the SDWA, its implementing regulations, and the New York State Sanitary Code.

## STATEMENT OF FACTS

38.     On December 19, 2022, the Town notified numerous households (including Plaintiffs Sheldon and Blanchette) that the Town would soon discontinue their existing municipal water supplies, largely sourced from Gooseneck Pond.

39.     In exchange, the Town intends to move some, but not all, current users to a system served by a recently developed well-field. But this new well-field the Town developed to move Ticonderoga residents off surface water sources is nearly a complete failure.

10

40.     At all times relevant to this Complaint, Gooseneck Pond was and is an unfiltered surface water source. Gooseneck Pond supplies water to Ticonderoga's public water system. From Gooseneck Pond, water flows through the Gooseneck Pond Chlorination Station, after which water is distributed to several users before being stored in the Chilson Reservoir. After the Chilson Reservoir, water passes through the Chilson Reservoir Chlorination Station, before being distributed to hundreds of users in the Town of Ticonderoga.

41.     Ticonderoga was repeatedly notified of the violations at issue in this Complaint, including via communications from the State in 1991, 2009, 2011, 2013, and 2015, and communications from EPA in 2014 and 2015.

42.     At that time, USEPA and NYSDOH notified Ticonderoga of treatment and other alternatives to solving the surface filtration problem at Gooseneck Pond. The Town has failed to engage these alternatives in any meaningful way.

43.     The Town does not currently propose any comprehensive surface treatment options. Instead, it is now a half-decade into the design and planning, after several failed initiatives, to drill new drinking water wells into what they know to be a deficient aquifer, the water from which will cause significant short- and long-term harm to private residential plumbing and other systems.

*Ticonderoga Failed to Live Up to the Terms of its Settlement with USEPA and DOH*

44.     In April of 2018, the United States of America (on EPA's behalf) and DOH commenced a civil action against the Town, ostensibly seeking to enforce the Enhanced Treatment Rule. *See United States, et al. v. Town of Ticonderoga*, NY, 18-cv-442 (GLS/CFH) (NDNY 2018) [Dkt. 1]. Just three months later, in July 2018, the parties to the EPA enforcement action entered into the Consent Decree (**Ex. 1**) for the ostensible purpose of resolving the Town's chronic SDWA violations on a certain timetable. (*See*, *id*., ¶ 11(a)).

11

45.     To date, entry into that Consent Decree has been completely ineffective at resolving the Town's violations of the SDWA, and neither EPA nor DOH is actively enforcing its requirements. The Town remains in violation of the Enhanced Treatment Rule.

46.     On December 19, 2022, the Town notified certain residents that the Town would soon discontinue their existing municipal water supplies, largely sourced from Gooseneck Pond. In exchange, the Town intends to move some, but not all, current users to a system served by a recently developed well-field. But this new well-field the Town developed to move Ticonderoga residents off surface water sources is nearly a complete failure.

47.     A report by AES Northeast dated June 8, 2021, reveals a nearly irremediable hard water condition, and admits that the drinking water the Town intends to and does now supply to some residents, is almost literally "off the charts" for hardness, a highly corrosive and undesirable condition for any water system, much less the very water residents drink to live.

48.     By shifting to these new, deficient wells, the Town is creating other potentially unmanageable environmental and socio-economic impacts. The Town is a small community with a modest publicly-owned treatment works. Even apart from the solid waste impacts of most hard water treatment by-products, the Town POTW cannot handle the massive influx of hard water, even treated, over any long term.

49.     The Town itself lacks the funding to maintain and repair the POTW under these circumstances. And even if it could, it is discharging the remnants of that wastewater into Lake Champlain, thereby literally "down streaming" the problem to a drinking water source for thousands of other upstate New Yorkers who rely on that water body.

## AS AND FOR A FIRST CAUSE OF ACTIONS
*(Citizens' Enforcement of SDWA, 42 U.S.C. § 300j-8)*

50.     Plaintiffs repeat and reallege each and every allegation above as if set forth in full herein.

51.     Plaintiffs, as well as millions of other Americans, have historically received high quality drinking water every day from their publicly-owned (here, the Town of Ticonderoga, New York) water systems. Nonetheless, drinking water safety cannot be taken for granted. The importance of a reliable, clean water supply is manifest: there are a number of threats to drinking water, *e.g.*, improperly disposed of chemicals; animal wastes; pesticides; human threats; wastes injected underground; and naturally-occurring substances can all contaminate drinking water. Likewise, drinking water that is not properly treated or disinfected at a publicly-owned treatment works ("POTW"), or which travels through an improperly maintained distribution system, may also pose a health risk.

52.     To date, now five years after the Consent Decree, there is no real plan by the Town to mitigate or eliminate these adverse impacts, or their costs to taxpayers. The SDWA demands more to ensure compliance with its terms.

53.     The Town has been, is, and remains in violation of the Enhanced Treatment Rule and the Filtration Rule.

54.     The solutions considered under the Consent Decree are insufficient, inadequate, and will do more harm to public health and drinking water supply than any other available alternative. Photographs of the damage done to home appliances, fixtures, and personal property caused by the water from the replacement drinking water source are shown in the Appendix to this Complaint and incorporated herein.

55.     Under these circumstances, residents are justifiably concerned that they too will be subjected to this unsafe and harmful product being delivered by the Town into their homes. They do not want hard water; they do not want to purchase and install or ingest water softener systems or products; they do not want to be faced with the prospect of discoloration, corrosion and deterioration of pipes and fixtures. The Town must do better for its residents. The SDWA demands as much.

56.     USEPA and NYSDOH have failed to oversee, enforce, and/or administer the Consent Decree to ensure compliance with its terms.

57.     USEPA and NYSDOH have a mandatory, nondiscretionary duty to ensure that the Town complies with the SDWA. They have breached that duty. They have failed to enforce the Consent Decree or to protect public health.

58.     To comply with the SDWA, the Town, EPA, and DOH must revisit the entire plan to comply with the Enhanced Treatment Rule.

59.     Plaintiffs have satisfied all the legal prerequisites to filing this action, which is ripe and ready for judicial review.

**WHEREFORE**, Plaintiffs respectfully request an Order of this Court:

1.  Vacating, annulling, and setting the Consent Decree aside as outdated and inadequate to ensure achievement of SDWA compliance;

2.  Enjoining further work on any current water supply replacement plan pending submission and approval of a replacement plan that complies with the SDWA;

3.  Appointing a third-party monitor to oversee any future implementation of an SDWA compliance plan;

4.  Awarding Plaintiffs their reasonable attorney's fees and costs pursuant to 42 U.S.C. § 300j-8(d); and,

5. Awarding such other and further relief which as to the Court seems just, proper, and equitable.

Respectfully submitted,

YOUNG/SOMMER LLC

WILLIAM A. HURST
Bar Roll No. 510271
*Attorneys for Plaintiffs*
*William Grinnell, Frank Sheldon, and Daniel*
*Blanchette, Sr.*
Five Palisades Drive, Suite 300
Albany, New York 12205
Tel.: (518) 438-9907
Fax: (518) 438-9914
Email: whurst@youngsommer.com















# EXHIBIT 1

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK

```
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
UNITED STATES OF AMERICA                        :
                                                :
                    and                         :
                                                :
STATE OF NEW YORK by and through the            :
NEW YORK DEPARTMENT OF HEALTH                    :
                                                :
                    Plaintiffs,                 :
                                                :
            v.                                   :
                                                :  Civil No. 8:18-cv-442 (GLS/CFH)
TOWN OF TICONDEROGA, NEW YORK,                   :
                                                :
                    Defendant.                  :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
```

CONSENT DECREE

## TABLE OF CONTENTS

I.      JURISDICTION AND VENUE ..................................................................................... 2
II.     APPLICABILITY ......................................................................................................... 2
III.    DEFINITIONS ............................................................................................................. 3
IV.     CIVIL PENALTY ......................................................................................................... 4
V.      COMPLIANCE REQUIREMENTS .............................................................................. 4
VI.     SUPPLEMENTAL ENVIRONMENTAL PROJECTS ................................................. 8
VII.    REPORTING REQUIREMENTS ............................................................................... 11
VIII.   STIPULATED PENALTIES ....................................................................................... 12
IX.     FORCE MAJEURE .................................................................................................... 14
X.      DISPUTE RESOLUTION .......................................................................................... 15
XI.     INFORMATION COLLECTION AND RETENTION ............................................... 17
XII.    EFFECT OF SETTLEMENT/RESERVATION OF RIGHTS ..................................... 18
XIII.   COSTS ....................................................................................................................... 19
XIV.    NOTICES ................................................................................................................... 19
XV.     EFFECTIVE DATE .................................................................................................... 20
XVI.    RETENTION OF JURISDICTION ............................................................................ 20
XVII.   MODIFICATION ....................................................................................................... 20
XVIII.  TERMINATION ......................................................................................................... 21
XIX.    PUBLIC PARTICIPATION ........................................................................................ 21
XX.     SIGNATORIES/SERVICE ......................................................................................... 21
XXI.    INTEGRATION .......................................................................................................... 22
XXII.   FINAL JUDGMENT ................................................................................................... 22

Whereas Plaintiffs United States of America, on behalf of the United States Environmental Protection Agency ("EPA"), and the State of New York, by and through the New York Department of Health, ("State" or "New York") have filed a complaint in this action concurrently with this Consent Decree, alleging that the Town of Ticonderoga, New York ("Defendant" or "Ticonderoga") has violated and continues to violate the Long Term 2 Enhanced Surface Water Treatment Rule promulgated pursuant to Section 1412 of the Safe Drinking Water Act ("SDWA"), 42 U.S.C. § 300g-1, and portions of the New York State Sanitary Code promulgated pursuant to Sections 201 and 205 of the New York Public Health Law.

Whereas Ticonderoga, located in Essex County, New York, on behalf of water districts 9N and 74 Water District (SW01), Street Road Water District (SW02), Alexandra Water District No. 1(SW03), Homeland Water District (SW04), Alexandra Water District No. 2(SW05), Central Water District (SW06), Park Avenue Water District (SW07) and Shore Airport Water District (SW09) and out of district users including but not limited to the Eagle Lake-Chilson Users operates a public water system. The Complaint against Ticonderoga alleges that it failed to provide the required treatment for *Cryptosporidium*, and failed to cover or provide the required treatment for an uncovered finished water storage facility, by the regulatory deadline of October 1, 2014. The Complaint also alleges that Ticonderoga failed to provide redundant chlorination to protect residents in the event that the primary chlorination station fails or loses power, failed to adequately treat unfiltered surface water received by certain users, defined below as the "Eagle Lake - Chilson Users," and failed to keep its filtration plant in continuous working order.

Whereas in October 2016, the Ticonderoga Town Board passed a bond resolution for final design of the Ticonderoga water system improvements on behalf of the above water districts.

Whereas in February 2017, Ticonderoga submitted a complete New York State Drinking Water Revolving Fund financing application to the New York State Environmental Facilities Corporation and the New York State Department of Health. The application included an engineering report and documentation of State Environmental Quality Review Act review, district formation, and bond resolution.

Whereas in December 2014, the New York Housing Trust Fund Corporation awarded Ticonderoga $600,000 in New York State Community Development Block Grant program funds. In October 2017, New York's Environmental Facilities Corporation Board of Directors approved a Drinking Water State Revolving Fund grant for up to $2 million and 0% interest loan for $10,033,104.00, as well as a Water Infrastructure Improvement Act (WIIA) Grant for up to $1 million. These grants and loan are intended to fund Ticonderoga's work to bring its drinking water system into compliance with Federal and State laws and regulations.

Whereas Defendant does not admit any liability to the United States or New York arising out of the transactions or occurrences alleged in the Complaint.

Whereas the Parties recognize, and the Court by entering this Consent Decree finds, that this Consent Decree has been negotiated by the Parties in good faith and will avoid litigation among the Parties and that this Consent Decree is fair, reasonable, and in the public interest.

NOW, THEREFORE, before the taking of any testimony, without the adjudication or admission of any issue of fact or law except as provided in Section I and with the consent of the Parties, IT IS HEREBY ADJUDGED, ORDERED, AND DECREED as follows:

## I.     JURISDICTION AND VENUE

1.     This Court has jurisdiction over the subject matter of this action, and over the Parties pursuant to 28 U.S.C. §§ 1331, 1345, and 1355, and Section 1414(b) of SDWA, 42 U.S.C. § 300g-3(b). This Court has supplemental jurisdiction over the State law claims asserted by New York pursuant to 28 U.S.C. § 1367. Venue lies in this District pursuant to 28 U.S.C. §§ 1391(b) and 1395(a) because Defendant is located in this judicial district and the violations alleged in the Complaint are alleged to have occurred in this judicial district. For purposes of this Decree, or any action to enforce this Decree, Defendant consents to the Court's jurisdiction over this Decree and any such action and over Defendant and consents to venue in this judicial district.

2.     For purposes of this Consent Decree, Defendant agrees that the Complaint states claims upon which relief may be granted pursuant to Section 1414(b) of SDWA, 42 U.S.C. § 300g-3(b), and New York Public Health Law § 1100.

## II.     APPLICABILITY

3.     The obligations of this Consent Decree apply to and are binding upon the United States and the State, and upon Defendant and any successors, assigns, or other entities or persons otherwise bound by law.

4.     No transfer of ownership or operation of the Ticonderoga Water Department, whether in compliance with the procedures of this Paragraph or otherwise, shall relieve Defendant of its obligation to ensure that the terms of the Decree are implemented. At least 30 Days prior to such transfer, Defendant shall provide a copy of this Consent Decree to the proposed transferee and shall simultaneously provide written notice of the prospective transfer, together with a copy of the proposed written agreement, to EPA Region 2, the United States Attorney for the Northern District of New York, and the United States Department of Justice, in accordance with Section XIV (Notices). Any attempt to transfer ownership or operation of the Ticonderoga Water Department without complying with this Paragraph constitutes a violation of this Decree.

5.     Defendant shall provide a copy of this Consent Decree to all officers, employees, and agents whose duties might reasonably include compliance with any provision of this Decree, as well as to any contractor retained to perform work required under this Consent Decree. Defendant shall condition any contract entered into by Defendant after the Effective Date upon performance of the work in conformity with the terms of this Consent Decree.

6.     In any action to enforce this Consent Decree, Defendant shall not raise as a defense the failure by any of its officers, directors, employees, agents, or contractors to take any actions necessary to comply with the provisions of this Consent Decree.

2

## III. DEFINITIONS

7. Terms used in this Consent Decree that are defined in the Act or in the National Primary Drinking Water Regulations shall have the meanings assigned to them in the Act or such regulations, unless otherwise provided in this Decree. Whenever the terms set forth below are used in this Consent Decree, the following definitions shall apply:

"Complaint" shall mean the complaint filed by the United States and the State in this action;

"Day" shall mean a calendar day unless expressly stated to be a business day. In computing any period of time under this Consent Decree, where the last day would fall on a Saturday, Sunday, or federal holiday, the period shall run until the close of business of the next business day;

"Defendant" shall mean the Town of Ticonderoga;

"Eagle Lake - Chilson Users" shall mean those users who receive water from the water main between the Eagle Lake Chlorination Station and Chilson Reservoir as of the Effective Date of this Consent Decree.

"Eagle Lake - Chilson Water System Improvements" shall mean those actions necessary to correct all legal and regulatory violations associated with the Eagle Lake - Chilson Users' water supply, including actions necessary to cease water transmission to Eagle Lake - Chilson Users who disconnect from the Ticonderoga public water system.

"EPA" shall mean the United States Environmental Protection Agency and any of its successor departments or agencies;

"Effective Date" shall have the definition provided in Section XV.

"Paragraph" shall mean a portion of this Decree identified by an arabic numeral;

"Parties" shall mean the United States, the State, and Defendant;

"Section" shall mean a portion of this Decree identified by a roman numeral;

"State" shall mean the State of New York, by and through the New York Department of Health; and

"United States" shall mean the United States of America, acting on behalf of EPA.

3

IV.    CIVIL PENALTY

8.    Within 60 Days after the Effective Date, Defendant shall pay the sum of $50,000 as a civil penalty. No interest shall accrue if the civil penalty is paid within 60 Days after the Effective Date.

9.    Defendant shall pay half of the civil penalty due to the U.S. Department of Justice account, in accordance with instructions provided to Defendant by the Financial Litigation Unit ("FLU") of the United States Attorney's Office for the Northern District of New York after the Effective Date. The payment instructions provided by the FLU will include a Consolidated Debt Collection System ("CDCS") number, which Defendant shall use to identify all payments required to be made in accordance with this Consent Decree. The FLU will provide the payment instructions to:

Hon. Joseph Giordano
Supervisor, Town of Ticonderoga
132 Montcalm Street
Ticonderoga, NY, 12883
518-585-6265

supervisor@townofticonderoga.org on behalf of Defendant. Defendant may change the individual to receive payment instructions on its behalf by providing written notice of such change to the United States and EPA in accordance with Section XIV (Notices).

At the time of payment, Defendant shall send notice that payment has been made: (i) to EPA via email at cinwd_acctsreceivable@epa.gov or via regular mail at EPA Cincinnati Finance Office, 26 W. Martin Luther King Drive, Cincinnati, Ohio 45268; and (ii) to the United States via email or regular mail in accordance with Section XIV. Such notice shall state that the payment is for the civil penalty owed pursuant to the Consent Decree in *United States and State of New York v. Town of Ticonderoga* and shall reference the civil action number, CDCS Number and DOJ case number 90-5-1-1-11348.

10.    Defendant shall pay the other half of the civil penalty to New York by sending a check payable to "The State of New York" by certified mail, return receipt requested, to the New York State Department of Health, Corning Tower, Room 2438, Empire State Plaza, Albany, NY 12237.

V.    COMPLIANCE REQUIREMENTS

11.    Long Term Measures Defendant shall implement the following long term measures with regard to ongoing construction and operation of the Ticonderoga Water Department, leading to compliance with the SDWA and all applicable regulations promulgated thereunder, as well as the New York Public Health Law and all applicable regulations promulgated thereunder. Defendant shall achieve compliance by meeting the following milestones, each of which represents a compliance requirement:

a.    By January 18, 2018, submit final plans, designs, and specifications for

4

Chilson water storage tank and Street Road groundwater supply, including the construction schedule designed to achieve the December 24, 2019 final deadline for those projects.

b. By March 19, 2018, advertise bids for Street Road well field control building, water mains, and Chilson water storage tank.

c. By May 11, 2018, award contract(s) for Street Road well field control building, water mains, and Chilson water storage tank.

d. By May 28, 2018, issue notice(s) to proceed for Street Road well field control building, water mains, and Chilson water storage tank.

e. By August 17, 2018 submit a basis of design report for Baldwin Road filter plant improvements.

f. By January 15, 2019 submit final plans, designs, and specifications for Baldwin Road filter plant improvements, including the construction schedule designed to achieve the June 26, 2020 final deadline for those improvements.

g. By March 15, 2019, advertise bids for Baldwin Road filter plant improvements.

h. By May 10, 2019, award contract(s) for Baldwin Road filter plant improvements.

i. By May 24, 2019, issue notice to proceed for Baldwin Road filter plant improvements.

j. By December 24, 2019, complete construction of Street Road well field control building, water mains, and Chilson water storage tank and begin operation in compliance with National Primary Drinking Water Regulations.

k. By June 26, 2020, complete construction of Baldwin Road filter plant improvements and begin operation of improved Baldwin Road filter plant in compliance with National Primary Drinking Water Regulations.

l. By June 30, 2020, submit a preliminary engineering report for the Eagle Lake - Chilson Water System Improvements.

m. By June 14, 2021, submit final map, plan, and report for the Eagle Lake - Chilson Water System Improvements.

n. By June 15, 2022, begin final design of Eagle Lake - Chilson Water System Improvements.

o. By May 24, 2023, submit final plans, designs, and specifications for the

5

Eagle Lake - Chilson Water System Improvements including the construction schedule designed to achieve the final deadline of June 24, 2025 for these improvements.

p. By September 27, 2023, advertise for bids for Eagle Lake - Chilson Water System Improvements.

q. By November 28, 2023, award contract for Eagle Lake - Chilson Water System Improvements.

r. By January 10, 2024, issue notice to proceed for Eagle Lake - Chilson Water System Improvements.

s. By June 24, 2025, complete construction of Eagle Lake - Chilson Water System Improvements, and fully decommission Gooseneck Pond as a drinking water source.

12. Submission of Deliverables. Defendant shall submit deliverables associated with the Long Term Measures in subparagraphs 11.a, 11.e, 11.f, and 11.o, to New York pursuant to Section XIV (Notices). New York may approve the submission or decline to approve it and provide written comments. Within 30 Days of receiving New York's written comments, Defendant shall either: (i) alter the submission consistent with New York's written comments and provide the revised submission to New York and EPA for final approval, or (ii) submit the matter for dispute resolution under Section X. Upon receipt of New York's final approval of the submission, or upon completion of the submission pursuant to dispute resolution, Defendant shall complete the project outlined in the submission in accordance with the schedule in the approved submission. Defendant and New York will copy EPA on all submissions and correspondence related to subparagraphs 11.a, 11.e, 11.f, and 11.o deliverables.

13. Interim Measures

a. Monitoring:

(1) Ticonderoga shall continue to monitor Gooseneck Pond by sampling water at least monthly in accordance with the Watershed Water Quality Surveillance and Monitoring Program until Gooseneck Pond is no longer a drinking water source. Ticonderoga shall also continue all other water monitoring required by 10 NYCRR Subpart 5-1, and 40 C.F.R. Part 141, Subparts H, and T. Ticonderoga is not required to conduct the second round of source water monitoring that would be required under 40 C.F.R. § 141.701(b).

(2) Within 120 days of the Effective Date, Ticonderoga shall install continuous filter turbidimeters on each individual filter at the Baldwin Road filter plant. Turbidity monitoring shall be conducted using an approved method set forth in 40 C.F.R. §141.74, turbidimeters shall be calibrated in accordance with manufacturers specifications, and results shall be recorded at least every 15 minutes. Each turbidimeter shall be equipped with an alarm system set at 0.5

6

NTU.

        (a)      A dedicated turbidimeter will be installed on each of the four filter trains. The turbidimeters shall determine turbidity by nephelometry. Each turbidimeter will be purchased calibrated from the manufacturer and will be recalibrated utilizing the method and frequency indicated in the manufacturers' specifications. Turbidity will be logged at 15 minute intervals. An alarm condition will be hardwired from each turbidimeter controller to the existing filter plant autodialer to call out to the operator in the event that any of the dedicated turbidimeters registers a turbidity at or above 0.5 for a 15 min duration.

        (b)      As the Baldwin Road filter plant does not have automatic shutdown capability, upon receipt of an alarm notification an on-call operator will respond to the Baldwin Road filter plant. The filter train experiencing the elevated turbidity levels will be isolated utilizing manual valves, and the source of the elevated turbidity will be investigated and resolved prior to placing the train back online.

        (c)      Filter investigations will include, recording of filter pressures and backwash of the vessels to evaluate if filter performance is due to routine/non-routine filter plugging and performance issues. If the filter vessel appears to be unresponsive to normal operational procedures, the vessel will be opened and the septum and retainer system will be hoisted from the filter and visually inspected for compromised areas (seals, brackets, septum media, excessive DE buildup, etc.). The problem, when isolated, will be rectified and the filter re-assembled, re-coated and held in recirculation mode, observing pressures and turbidity to make sure problems have been fully addressed. After observation of adequate performance, the filter vessel will be returned to service.

        (d)      The public will be notified following any occurrence in which combined filter effluent turbidity, or any individual filter effluent turbidity, exceeds the current New York Part 5 Subpart 5-1 regulatory MCL of 1.0 NTU for more than five percent of the composite filter effluent measurements within a month, or any occurrence of a filter turbidity in excess of 5 NTU. Public notification will be made through the media (local radio and television stations) and Ticonderoga's notification system.

    (3)      Ticonderoga shall provide the results of all monitoring conducted pursuant to this Paragraph to EPA and New York as part of its Paragraph 27.a semi-annual reports. The monitoring results from each individual filter turbidimeter can be summarized to include the range of turbidity values recorded each month, date and time frame for any values greater than 0.5 NTU, and a description of the actions taken.

b.      Public Notice:

(1)     Ticonderoga shall notify the public every three months that it is in violation of the SDWA and the New York Public Health Law in accordance with 40 C.F.R. 141 Subpart Q (40 C.F.R. 141.201 through 141.211 and Appendices A, B, and C) and 10 NYCRR 5-1.78. The notice shall include a description of the heightened risks faced by some Eagle Lake - Chilson Users due to inadequate chlorine contact times. Ticonderoga shall provide New York and EPA with copies of the notifications it has posted as part of its Paragraph 27.a semi-annual reports.

(2)     By January 31, 2018, Ticonderoga shall notify all Eagle Lake – Chilson Users by mail that they will be required to disconnect from the Town water system by 2024-2025, and shall advise the Eagle Lake – Chilson Users that they will be required to either dig an individual drinking water well or fund Eagle Lake - Chilson community drinking water wells at that time.

14.     Permits. Where any compliance obligation under this Section requires Defendant to obtain a federal, state, or local permit or approval, Defendant shall submit timely and complete applications and take all other actions necessary to obtain all such permits or approvals. Defendant may seek relief under the provisions of Section IX (Force Majeure) for any delay in the performance of any such obligation resulting from a failure to obtain, or a delay in obtaining, any permit or approval required to fulfill such obligation, if Defendant has submitted timely and complete applications and has taken all other actions necessary to obtain all such permits or approvals.

## VI.      SUPPLEMENTAL ENVIRONMENTAL PROJECTS

15.     Defendant shall implement two Supplemental Environmental Projects ("SEPs"), in accordance with all provisions of this Section VI. The SEPs shall be completed in accordance with the schedule set forth herein.

16.     Defendant is responsible for the satisfactory completion of the SEPs in accordance with the requirements of this Decree. Defendant may use contractors or consultants in planning and implementing the SEPs.

17.     With regard to the SEPs, Defendant certifies the truth and accuracy of each of the following:

a.      that all cost information provided to EPA in connection with EPA's approval of the SEPs is complete and accurate and that Defendant in good faith estimates that the cost to implement the SEPs is $100,000.00;

b.      that, as of the date of executing this Decree, Defendant is not required to perform or develop any of the SEPs by any federal, state, or local law or regulation and is not required to perform or develop any of the SEPs by agreement, grant, or as injunctive

8

relief awarded in any other action in any forum;

 c. that none of the SEPs is a project that Defendant was planning or intending to construct, perform, or implement other than in settlement of the claims resolved in this Decree;

 d. that Defendant has not received and will not receive credit for the SEPs in any other enforcement action;

 e. that Defendant will not receive any reimbursement for any portion of the SEP costs from any other person; and

 f. that (i) Defendant is not a party to any open federal financial assistance transaction that is funding or could fund the same activity as the SEPs; and (ii) Defendant has inquired of the SEP recipients and/or SEP implementers whether any of them is a party to an open federal financial assistance transaction that is funding or could fund the same activity as the SEP and has been informed by the recipients and/or the implementers that none of them is a party to such a transaction. For purposes of these certifications, the term "open federal financial assistance transaction" refers to a grant, cooperative agreement, loan, federally-guaranteed loan guarantee, or other mechanism for providing federal financial assistance whose performance period has not yet expired.

18. SEP1: Notification Project. Ticonderoga will provide town residents with access to a program in which they can elect to receive notifications of threats to their health and safety by phone call, email, or text message. Ticonderoga will maintain the program for a period of ten years from January 1, 2018 to January 1, 2028. Via this program, town residents will be notified of water system outages or concerns, including boil-water notices, and will therefore avoid exposure to drinking water that could be contaminated with pathogens. The program will also notify residents of other emergencies, including sewer or gas line breakages, flooding, police activity, and severe weather. Ticonderoga will keep records indicating the number of residents receiving notices through this system each year, and will keep a copy of each notice distributed through this system.

19. SEP2: Pharmaceutical Disposal Project. Within 90 days of the Effective Date, Defendant will establish a pharmaceutical disposal program whereby a dedicated town facility will anonymously accept any unwanted pharmaceutical products. Ticonderoga will advertise this program to town residents on its website and in the local newspaper. Ticonderoga will store and dispose of all pharmaceuticals turned in as part of this program in accordance with all applicable state, federal, and local laws and regulations. Ticonderoga will continue the project at least until this Consent Decree terminates as provided in Section XVIII. Ticonderoga will keep a log of pharmaceuticals collected by weight or volume each month, and will provide copies of this log as part of the SEP Completion Reports.

20. SEP Completion Reports

 a. By July 31st and January 31st of each year after the lodging of this Consent

Decree, until termination of this Decree pursuant to Section XVIII, Defendant shall submit by mail a semi-annual SEP Completion Report to the United States and the State, in accordance with Section XIV (Notices). The SEP Completion Report shall contain the following information:

(1)     a detailed description of the progress toward implementing the SEPs;

(2)     a description of any problems encountered in completing the SEPs and the solutions thereto;

(3)     an itemized list of all eligible SEP costs expended.

b.     In a final SEP Completion Report, in addition to the three items noted in Paragraph 20.a, Ticonderoga shall include a certification that both SEPs have been fully implemented pursuant to the provisions of this Decree; and a description of the environmental and public health benefits resulting from implementation of each SEP (with a quantification of the benefits and pollutant reductions, if feasible).

21.     EPA may, in its sole discretion, require information in addition to that described in the preceding Paragraph, in order to evaluate Defendant's completion report.

22.     After receiving the final SEP Completion Report, the United States shall notify Defendant whether or not Defendant has satisfactorily completed the SEPs. If Defendant has not completed the SEPs in accordance with this Consent Decree, stipulated penalties may be assessed under Section VIII.

23.     Disputes concerning the satisfactory performance of the SEPs and the amount of eligible SEP costs may be resolved under Section X (Dispute Resolution). No other disputes arising under this Section shall be subject to Dispute Resolution.

24.     Each submission required under this Section shall be signed by an official with knowledge of the relevant SEP(s) and shall bear the certification language set forth in Paragraph 30.

25.     Any public statement, oral or written, in print, film, or other media, made by Defendant making reference to any of the SEPs under this Decree shall include the following language: "This project was undertaken in connection with the settlement of an enforcement action, United States and State of New York v. Town of Ticonderoga, taken on behalf of the U.S. Environmental Protection Agency and New York Department of Public Health under the Safe Drinking Water Act."

26.     For federal income tax purposes, Defendant agrees that it will neither capitalize into inventory or basis nor deduct any costs or expenditures incurred in performing the SEPs.

## VII. REPORTING REQUIREMENTS

27. Defendant shall submit the following reports:

a. By July 31st and January 31st of each year after the lodging of this Consent Decree, until termination of this Decree pursuant to Section XVIII, Defendant shall submit by mail a semi-annual report for the preceding six months that shall include the status of each of the Paragraph 11 long term compliance measures and the Paragraph 13 Interim Measures. In particular, the report will compare the Defendant's progress against the construction schedule in each deliverable submitted under Paragraph 11.a, 11.f, and 11.o and approved under Paragraph 12. The report will note any problems encountered or anticipated, together with implemented or proposed solutions.

b. The report shall also include a description of any non-compliance with the requirements of this Consent Decree and an explanation of the violation's likely cause and of the remedial steps taken, or to be taken, to prevent or minimize such violation. If the cause of a violation cannot be fully explained at the time the report is due, Defendant shall so state in the report. Defendant shall investigate the cause of the violation and shall then submit an amendment to the report, including a full explanation of the cause of the violation, within 30 Days of the Day Defendant becomes aware of the cause of the violation. Nothing in this Paragraph or the following Paragraph relieves Defendant of its obligation to provide the notice required by Section IX (Force Majeure).

28. Whenever any violation of this Consent Decree or any other event affecting Defendant's performance under this Decree, or the performance of its Facility, may pose an immediate threat to the public health or welfare or the environment, Defendant shall notify EPA and the State orally or by electronic or facsimile transmission as soon as possible, but no later than 24 hours after Defendant first knew of the violation or event. This procedure is in addition to the requirements set forth in the preceding Paragraph.

29. All reports shall be submitted to the State and EPA via the persons designated in Section XIV (Notices).

30. Each report submitted by Defendant under this Section shall be signed by an official of the submitting party and include the following certification:

I certify under penalty of law that this document and all attachments were prepared under my direction or supervision in accordance with a system designed to assure that qualified personnel properly gather and evaluate the information submitted. Based on my inquiry of the person or persons who manage the system, or those persons directly responsible for gathering the information, the information submitted is, to the best of my knowledge and belief, true, accurate, and complete. I have no personal knowledge that the information submitted is other than true, accurate, and complete. I am aware that there are significant penalties for submitting false information, including the possibility of fine and imprisonment for knowing violations.

11

31. This certification requirement does not apply to emergency or similar notifications where compliance would be impractical.

32. The reporting requirements of this Consent Decree do not relieve Defendant of any reporting obligations required by the SDWA or implementing regulations, or by any other federal, state, or local law, regulation, permit, or other requirement.

33. Any information provided pursuant to this Consent Decree may be used by the United States in any proceeding to enforce the provisions of this Consent Decree and as otherwise permitted by law.

## VIII. STIPULATED PENALTIES

34. Defendant shall be liable to the United States and the State of New York for stipulated penalties for Consent Decree violations as specified below, unless excused under Section IX (Force Majeure). A violation includes failing to perform any obligation required by the terms of this Decree, according to all applicable requirements of this Decree, and within the specified time schedules established by or approved under this Decree.

35. Late Payment of Civil Penalty. If Defendant fails to pay the civil penalty required to be paid under Section IV (Civil Penalty) when due, Defendant shall pay a stipulated penalty of $1,000 per Day for each Day that the payment is late, together with interest accruing from the date on which the Consent Decree is lodged with the Court, at the rate specified in 28 U.S.C. § 1961 as of the date of lodging.

36. Compliance Milestones. The following stipulated penalties shall accrue per violation per Day for each violation of each requirement identified in Paragraph 11 or 13:

| Penalty Per Violation Per day | Period of Noncompliance |
| --- | --- |
| $500 | 1st through 14th day |
| $750 | 15th through 30th day |
| $1,000 | 31st day and beyond |

37. Reporting Requirements. The following stipulated penalties shall accrue per violation per Day for each violation of the reporting requirements of Section VI:

| Penalty Per Violation Per day | Period of Noncompliance |
| --- | --- |
| $200 | 1st through 14th day |
| $400 | 15th through 30th day |
| $600 | 31st day and beyond |

38. SEP Compliance

a. If Defendant halts or abandons work on either SEP, Defendant shall pay a stipulated penalty of $100,000 per SEP halted or abandoned. The penalty under this subparagraph shall accrue as of the date specified for completing the SEP or the date

12

performance ceases, whichever is earlier.

b. If Defendant fails to comply with the milestones in Section VI for implementing a SEP, Defendant shall pay a stipulated penalty of $300 per day per SEP for each failure to meet an applicable deadline.

39. Stipulated penalties under this Section shall begin to accrue on the Day after performance is due or on the Day a violation occurs, whichever is applicable, and shall continue to accrue until performance is satisfactorily completed or until the violation ceases. Stipulated penalties shall accrue simultaneously for separate violations of this Consent Decree.

40. Defendant shall pay stipulated penalties within 30 Days of a written demand by the United States. The United States will copy New York on any demand for payment of stipulated penalties.

41. The United States may in the unreviewable exercise of its discretion, reduce or waive stipulated penalties otherwise due it under this Consent Decree.

42. Stipulated penalties shall continue to accrue as provided in Paragraph 38, during any Dispute Resolution, but need not be paid until the following:

a. If the dispute is resolved by agreement or by a decision of EPA or the State that is not appealed to the Court, Defendant shall pay accrued penalties determined to be owing, together with interest, to the United States within 30 Days of the effective date of the agreement or the receipt of EPA's or the State's decision or order.

b. If the dispute is appealed to the Court and the United States or the State prevails in whole or in part, Defendant shall pay all accrued penalties determined by the Court to be owing, together with interest, within 60 Days of receiving the Court's decision or order, except as provided in subparagraph c, below.

c. If any Party appeals the District Court's decision, Defendant shall pay all accrued penalties determined to be owing, together with interest, within 15 Days of receiving the final appellate court decision.

43. Defendant shall pay half of the stipulated penalties owed under this Section VIII to the United States in the manner set forth and with the confirmation notices required by Paragraph 9, except that the transmittal letter shall state that the payment is for stipulated penalties and shall state for which violation(s) the penalties are being paid.

44. Defendant shall pay the other half of the stipulated penalties owed under this Section VIII to New York in the manner set forth in Paragraph 10.

45. If Defendant fails to pay stipulated penalties according to the terms of this Consent Decree, Defendant shall be liable for interest on such penalties, as provided for in 28 U.S.C. § 1961, accruing as of the date payment became due. Nothing in this Paragraph shall

13

be construed to limit the United States from seeking any remedy otherwise provided by law for Defendant's failure to pay any stipulated penalties.

46.     The payment of penalties and interest, if any, shall not alter in any way Defendant's obligation to complete the performance of the requirements of this Consent Decree.

47.     Non-Exclusivity of Remedy. Stipulated penalties are not the United States' or the State's exclusive remedy for violations of this Consent Decree. Subject to the provisions of Section XII (Effect of Settlement/Reservation of Rights), the United States and the State expressly each reserve the right to seek any other relief that it deems appropriate for Defendant's violation of this Decree or applicable law, including, but not limited to, an action against Defendant for statutory penalties, additional injunctive relief, mitigation or offset measures, and/or contempt. However, the amount of any statutory penalty assessed for a violation of this Consent Decree shall be reduced by an amount equal to the amount of any stipulated penalty assessed and paid pursuant to this Consent Decree.

## IX.     FORCE MAJEURE

48.     "Force majeure," for purposes of this Consent Decree, is defined as any event arising from causes beyond the control of Defendant, of any entity controlled by Defendant, or of Defendant's contractors, that delays or prevents the performance of any obligation under this Consent Decree despite Defendant's best efforts to fulfill the obligation. The requirement that Defendant exercise "best efforts to fulfill the obligation" includes using best efforts to anticipate any potential force majeure event and best efforts to address the effects of any potential force majeure event (a) as it is occurring and (b) following the potential force majeure, such that the delay and any adverse effects of the delay are minimized. "Force majeure" does not include Defendant's financial inability to perform any obligation under this Consent Decree.

49.     If any event occurs or has occurred that may delay the performance of any obligation under this Consent Decree, whether or not caused by a force majeure event, Defendant shall provide notice orally or by electronic or facsimile transmission to EPA and the State, within 72 hours of when Defendant first knew that the event might cause a delay. Within seven days thereafter, Defendant shall provide in writing to EPA and the State, as provided in Section XIV (Notices) an explanation and description of the reasons for the delay; the anticipated duration of the delay; all actions taken or to be taken to prevent or minimize the delay; a schedule for implementation of any measures to be taken to prevent or mitigate the delay or the effect of the delay; Defendant's rationale for attributing such delay to a force majeure event if it intends to assert such a claim; and a statement as to whether, in the opinion of Defendant, such event may cause or contribute to an endangerment to public health, welfare or the environment. Defendant shall include with any notice all available documentation supporting the claim that the delay was attributable to a force majeure. Failure to comply with the above requirements shall preclude Defendant from asserting any claim of force majeure for that event for the period of time of such failure to comply, and for any additional delay caused by such failure. Defendant shall be deemed to know of any circumstance of which Defendant, any entity controlled by Defendant, or Defendant's contractors knew or reasonably should have known.

14

50. If EPA, after a reasonable opportunity for review and comment by the State, agrees that the delay or anticipated delay is attributable to a force majeure event, the time for performance of the obligations under this Consent Decree that are affected by the force majeure event will be extended by EPA, after a reasonable opportunity for review and comment by the State, for such time as is necessary to complete those obligations. An extension of the time for performance of the obligations affected by the force majeure event shall not, of itself, extend the time for performance of any other obligation. EPA will notify Defendant in writing of the length of the extension, if any, for performance of the obligations affected by the force majeure event.

51. If EPA, after a reasonable opportunity for review and comment by the State, does not agree that the delay or anticipated delay has been or will be caused by a force majeure event, EPA will notify Defendant in writing of its decision.

52. If Defendant elects to invoke the dispute resolution procedures set forth in Section X (Dispute Resolution), it shall do so no later than 15 days after receipt of EPA's notice. In any such proceeding, Defendant shall have the burden of demonstrating by a preponderance of the evidence that the delay or anticipated delay has been or will be caused by a force majeure event, that the duration of the delay or the extension sought was or will be warranted under the circumstances, that best efforts were exercised to avoid and mitigate the effects of the delay, and that Defendant complied with the requirements of Paragraphs 48 and 49. If Defendant carries this burden, the delay at issue shall be deemed not to be a violation by Defendant of the affected obligation of this Consent Decree identified to EPA and the Court.

## X.  DISPUTE RESOLUTION

53. Unless otherwise expressly provided for in this Consent Decree, the dispute resolution procedures of this Section shall be the exclusive mechanism to resolve disputes arising under or with respect to this Consent Decree. Defendant's failure to seek resolution of a dispute under this Section shall preclude Defendant from raising any such issue as a defense to an action by the United States to enforce any obligation of Defendant arising under this Decree.

54. Informal Dispute Resolution. Any dispute subject to Dispute Resolution under this Consent Decree shall first be the subject of informal negotiations. The dispute shall be considered to have arisen when Defendant sends the United States and the State a written Notice of Dispute. Such Notice of Dispute shall state clearly the matter in dispute. The period of informal negotiations shall not exceed 20 Days from the date the dispute arises, unless that period is modified by written agreement. If the Parties cannot resolve a dispute by informal negotiations, then the position advanced by the United States shall be considered binding unless, within 20 Days after the conclusion of the informal negotiation period, Defendant invokes formal dispute resolution procedures as set forth below.

55. Formal Dispute Resolution. Defendant shall invoke formal dispute resolution procedures, within the time period provided in the preceding Paragraph, by serving on the United States and the State a written Statement of Position regarding the matter in dispute. The Statement of Position shall include, but need not be limited to, any factual data, analysis, or

15

opinion supporting Defendant's position and any supporting documentation relied upon by Defendant.

56. The United States and State shall serve their Statement of Position within 45 Days of receipt of Defendant's Statement of Position. The United States' and State's Statement of Position shall include, but need not be limited to, any factual data, analysis, or opinion supporting that position and any supporting documentation relied upon by the United States. The United States' and State's Statement of Position shall be binding on Defendant, unless Defendant files a motion for judicial review of the dispute in accordance with the following Paragraph.

57. Defendant may seek judicial review of the dispute by filing with the Court and serving on the United States and State, in accordance with Section XIV (Notices), a motion requesting judicial resolution of the dispute. The motion must be filed within ten Days of receipt of the United States' and State's Statement of Position pursuant to the preceding Paragraph. The motion shall contain a written statement of Defendant's position on the matter in dispute, including any supporting factual data, analysis, opinion, or documentation, and shall set forth the relief requested and any schedule within which the dispute must be resolved for orderly implementation of the Consent Decree.

58. The United States shall respond to Defendant's motion within the time period allowed by the Local Rules of this Court. Defendant may file a reply memorandum, to the extent permitted by the Local Rules.

59. Standard of Review

a. Disputes Concerning Matters Accorded Record Review. Except as otherwise provided in this Consent Decree, in any dispute brought under Paragraph 55 pertaining to the adequacy or appropriateness of plans, procedures to implement plans, schedules or any other items requiring approval by EPA or the State under this Consent Decree; the adequacy of the performance of work undertaken pursuant to this Consent Decree; and all other disputes that are accorded review on the administrative record under applicable principles of administrative law, Defendant shall have the burden of demonstrating, based on the administrative record, that the position of the United States is arbitrary and capricious or otherwise not in accordance with law.

b. Other Disputes. Except as otherwise provided in this Consent Decree, in any other dispute brought under Paragraph 55, Defendant shall bear the burden of demonstrating that its position complies with this Consent Decree and better furthers the objectives of the Consent Decree.

60. The invocation of dispute resolution procedures under this Section shall not, by itself, extend, postpone, or affect in any way any obligation of Defendant under this Consent Decree, unless and until final resolution of the dispute so provides. Stipulated penalties with respect to the disputed matter shall continue to accrue from the first Day of noncompliance, but payment shall be stayed pending resolution of the dispute as provided in Paragraph 42. If

16

Defendant does not prevail on the disputed issue, stipulated penalties shall be assessed and paid as provided in Section VIII (Stipulated Penalties).

## XI.  INFORMATION COLLECTION AND RETENTION

61.    The United States, the State, and their representatives, including attorneys, contractors, and consultants, shall have the right of entry into any facility covered by this Consent Decree, at all reasonable times, upon presentation of credentials, to:

      a.    monitor the progress of activities required under this Consent Decree;

      b.    verify any data or information submitted to the United States or the State in accordance with the terms of this Consent Decree;

      c.    obtain samples and, upon request, splits of any samples taken by Defendant or its representatives, contractors, or consultants;

      d.    obtain documentary evidence, including photographs and similar data; and

      e.    assess Defendant's compliance with this Consent Decree.

62.    Upon request, Defendant shall provide EPA and the State or their authorized representatives splits of any samples taken by Defendant. Upon request, EPA and the State shall provide Defendant splits of any samples taken by EPA or the State.

63.    Until five years after the termination of this Consent Decree, Defendant shall retain, and shall instruct its contractors and agents to preserve, all non-identical copies of all documents, records, or other information (including documents, records, or other information in electronic form) in its or its contractors' or agents' possession or control, or that come into its or its contractors' or agents' possession or control, and that relate in any manner to Defendant's performance of its obligations under this Consent Decree. This information-retention requirement shall apply regardless of any contrary corporate or institutional policies or procedures. At any time during this information-retention period, upon request by the United States or the State, Defendant shall provide copies of any documents, records, or other information required to be maintained under this Paragraph.

64.    At the conclusion of the information-retention period provided in the preceding Paragraph, Defendant shall notify the United States and the State at least 90 Days prior to the destruction of any documents, records, or other information subject to the requirements of the preceding Paragraph and, upon request by the United States or the State, Defendant shall deliver any such documents, records, or other information to EPA or the State. Defendant may assert that certain documents, records, or other information is privileged under the attorney-client privilege or any other privilege recognized by federal law. If Defendant asserts such a privilege, it shall provide the following: (a) the title of the document, record, or information; (b) the date of the document, record, or information; (c) the name and title of each author of the document, record, or information; (d) the name and title of each addressee and recipient; (e) a description of

17

the subject of the document, record, or information; and (f) the privilege asserted by Defendant. However, no documents, records, or other information created or generated pursuant to the requirements of this Consent Decree shall be withheld on grounds of privilege.

65.     Defendant may also assert that information required to be provided under this Section is protected as Confidential Business Information ("CBI") under 40 C.F.R. Part 2. As to any information that Defendant seeks to protect as CBI, Defendant shall follow the procedures set forth in 40 C.F.R. Part 2.

66.     This Consent Decree in no way limits or affects any right of entry and inspection, or any right to obtain information, held by the United States or the State pursuant to applicable federal or state laws, regulations, or permits, nor does it limit or affect any duty or obligation of Defendant to maintain documents, records, or other information imposed by applicable federal or state laws, regulations, or permits.

## XII.     EFFECT OF SETTLEMENT/RESERVATION OF RIGHTS

67.     This Consent Decree resolves the civil claims of the United States and the State for the violations alleged in the Complaint filed in this action through the date of lodging.

68.     The United States and the State reserve all legal and equitable remedies available to enforce the provisions of this Consent Decree. This Consent Decree shall not be construed to limit the rights of the United States or the State to obtain penalties or injunctive relief under the Act or implementing regulations, or under other federal or state laws, regulations, or permit conditions. The United States and the State further reserve all legal and equitable remedies to address any imminent and substantial endangerment to the public health or welfare or the environment arising at, or posed by, the Ticonderoga Water Department, whether related to the violations addressed in this Consent Decree or otherwise.

69.     In any subsequent administrative or judicial proceeding initiated by the United States or the State for injunctive relief, civil penalties, other appropriate relief relating to Defendant's violations, Defendant shall not assert, and may not maintain, any defense or claim based upon the principles of waiver, res judicata, collateral estoppel, issue preclusion, claim preclusion, claim-splitting, or other defenses based upon any contention that the claims raised by the United States or the State in the subsequent proceeding were or should have been brought in the instant case, except with respect to claims that have been specifically resolved pursuant to Paragraph 67.

70.     This Consent Decree is not a permit, or a modification of any permit, under any federal, State, or local laws or regulations. Defendant is responsible for achieving and maintaining complete compliance with all applicable federal, State, and local laws, regulations, and permits; and Defendant's compliance with this Consent Decree shall be no defense to any action commenced pursuant to any such laws, regulations, or permits, except as set forth herein. The United States and the State do not, by their consent to the entry of this Consent Decree, warrant or aver in any manner that Defendant's compliance with any aspect of this Consent

Decree will result in compliance with provisions of the SDWA, 42 U.S.C. § 300f *et seq*., or with any other provisions of federal, State, or local laws, regulations, or permits.

71.     This Consent Decree does not limit or affect the rights of Defendant or of the United States or the State against any third parties, not party to this Consent Decree, nor does it limit the rights of third parties, not party to this Consent Decree, against Defendant, except as otherwise provided by law.

72.     This Consent Decree shall not be construed to create rights in, or grant any cause of action to, any third party not party to this Consent Decree.

## XIII.   COSTS

73.     The Parties shall bear their own costs of this action, including attorneys' fees, except that the United States and the State shall be entitled to collect the costs (including attorneys' fees) incurred in any action necessary to collect any portion of the civil penalty or any stipulated penalties due but not paid by Defendant.

## XIV.   NOTICES

74.     Unless otherwise specified in this Decree, whenever notifications, submissions, or communications are required by this Consent Decree, they shall be made in writing and addressed as follows:

As to the United States by email:      eescdcopy.enrd@usdoj.gov
                                        Re: DJ # 90-5-1-1-11348

As to the United States by mail:       EES Case Management Unit
                                        Environment and Natural Resources Division
                                        U.S. Department of Justice
                                        P.O. Box 7611
                                        Washington, D.C.  20044-7611
                                        Re: DJ # 90-5-1-1-11348

| | |
|---|---|
| As to EPA: | Phyllis Feinmark and Nicole Kraft |
| | US EPA Region 2 |
| | 290 Broadway |
| | New York, NY 10007 |
| | |
| As to New York: | Kerry-Ann Lawrence and Roger Sokol |
| | New York State Department of Health |
| | Empire State Plaza, Corning Tower |
| | Albany, NY 12237 |
| | |
| As to Defendant: | Town Supervisor |
| | Town of Ticonderoga |
| | 132 Montcalm Street |
| | P.O. Box 471 |
| | Ticonderoga, NY |

75.     Any Party may, by written notice to the other Parties, change its designated notice recipient or notice address provided above.

76.     Notices submitted pursuant to this Section shall be deemed submitted upon mailing, unless otherwise provided in this Consent Decree or by mutual agreement of the Parties in writing.

## XV.     EFFECTIVE DATE

77.     The Effective Date of this Consent Decree shall be the date upon which this Consent Decree is entered by the Court or a motion to enter the Consent Decree is granted, whichever occurs first, as recorded on the Court's docket.

## XVI.     RETENTION OF JURISDICTION

78.     The Court shall retain jurisdiction over this case until termination of this Consent Decree, for the purpose of resolving disputes arising under this Decree or entering orders modifying this Decree, pursuant to Sections X and XVII, or effectuating or enforcing compliance with the terms of this Decree.

## XVII.   MODIFICATION

79.     The terms of this Consent Decree, including any attached appendices, may be modified only by a subsequent written agreement signed by all the Parties. Where the modification constitutes a material change to this Decree, it shall be effective only upon approval by the Court.

80.     Any disputes concerning modification of this Decree shall be resolved pursuant to Section X (Dispute Resolution), provided, however, that, instead of the burden of proof provided

by Paragraph 59, the Party seeking the modification bears the burden of demonstrating that it is entitled to the requested modification in accordance with Federal Rule of Civil Procedure 60(b).

## XVIII. TERMINATION

81. After Defendant has completed the requirements of Section V (Compliance Requirements), has thereafter maintained continuous satisfactory compliance with this Consent Decree for a period of three years, has complied with all other requirements of this Consent Decree, including those related to the SEPs required by Section VI, and has paid the civil penalty and any accrued stipulated penalties as required by this Consent Decree, Defendant may serve upon the United States and the State a Request for Termination, stating that Defendant has satisfied those requirements, together with all necessary supporting documentation.

82. Following receipt by the United States and the State of Defendant's Request for Termination, the Parties shall confer informally concerning the Request and any disagreement that the Parties may have as to whether Defendant has satisfactorily complied with the requirements for termination of this Consent Decree. If the United States after consultation with the State agrees that the Decree may be terminated, the Parties shall submit, for the Court's approval, a joint stipulation terminating the Decree.

83. If the United States after consultation with the State does not agree that the Decree may be terminated, Defendant may invoke Dispute Resolution under Section X. However, Defendant shall not seek Dispute Resolution of any dispute regarding termination until 90 Days after service of its Request for Termination.

## XIX. PUBLIC PARTICIPATION

84. This Consent Decree shall be lodged with the Court for a period of not less than 30 Days for public notice and comment in accordance with 28 C.F.R. § 50.7. The United States reserves the right to withdraw or withhold its consent if the comments regarding the Consent Decree disclose facts or considerations indicating that the Consent Decree is inappropriate, improper, or inadequate. Defendant consents to entry of this Consent Decree without further notice and agrees not to withdraw from or oppose entry of this Consent Decree by the Court or to challenge any provision of the Decree, unless the United States has notified Defendant in writing that it no longer supports entry of the Decree.

## XX. SIGNATORIES/SERVICE

85. Each undersigned representative of Defendant, New York, and the Assistant Attorney General for the Environment and Natural Resources Division of the Department of Justice certifies that he or she is fully authorized to enter into the terms and conditions of this Consent Decree and to execute and legally bind the Party he or she represents to this document.

86. This Consent Decree may be signed in counterparts, and its validity shall not be challenged on that basis. Defendant agrees to accept service of process by mail with respect to all matters arising under or relating to this Consent Decree and to waive the formal service

21

requirements set forth in Rules 4 and 5 of the Federal Rules of Civil Procedure and any applicable Local Rules of this Court including, but not limited to, service of a summons.

## XXI. INTEGRATION

87.     This Consent Decree constitutes the final, complete, and exclusive agreement and understanding among the Parties with respect to the settlement embodied in the Decree and supersedes all prior agreements and understandings, whether oral or written, concerning the settlement embodied herein. The Parties acknowledge that there are no representations, agreements, or understandings relating to the settlement other than those expressly contained in this Consent Decree.

## XXII. FINAL JUDGMENT

88.     Upon approval and entry of this Consent Decree by the Court, this Consent Decree shall constitute a final judgment of the Court as to the United States, the State, and Defendant. The Court finds that there is no just reason for delay and therefore enters this judgment as a final judgment under Fed. R. Civ. P. 54 and 58.


Dated and entered this 11 day of  July  , 2018.


Gary L. Sharpe
U.S. District Judge

22

FOR THE UNITED STATES OF AMERICA:

3/17/15

Date

Jeffrey H. Wood
Acting Assistant Attorney General
Environment and Natural Resources Division
U.S. Department of Justice

Robert E. Maher Jr. (Bar Roll No. 102916)
Assistant Section Chief
Environmental Enforcement Section
Environment and Natural Resources Division
U.S. Department of Justice
Washington, DC  20044-7611


John D. Hoggan, Jr. (Bar Roll No. 511254)
Assistant United States Attorney
Northern District of New York
445 Broadway
Room 218
Albany, NY  12207-2924
(518) 431-0247

23

FOR THE U.S. ENVIRONMENTAL PROTECTION
AGENCY:

_____

Eric Schaaf
Regional Counsel
U.S. Environmental Protection Agency, Region 2

_____

Phyllis Feinmark
Chief, Water and General Law Branch
Office of Regional Counsel
U.S. Environmental Protection Agency, Region 2

ERIC T. SCHNEIDERMAN
Attorney General
State of New York
*Attorney for Plaintiff New York State
Department of Health*

Dated: February 28, 2018

LISA M BURIANEK
Assistant Attorney General
Environmental Protection Bureau
The Capitol
Albany, New York 12224
(518) 776 -2423
Lisa.Burianek@ag.ny.gov

25

FOR THE TOWN OF TICONDEROGA:

1/22/18
Date

_____
Hon. Joseph Giordano, Town Supervisor
Town of Ticonderoga
132 Montcalm Street
P.O. Box 471
Ticonderoga, NY 12883

Approved as to form

1/26/18
Date

Meyer & Fuller, PLLC, Counsel to the Town of
Ticonderoga

_____
Matthew F. Fuller, Esq.
161 Ottawa Street
Lake George, NY 12845

26

# EXHIBIT 2



ATTORNEYS AT LAW

EXECUTIVE WOODS, FIVE PALISADES DRIVE, ALBANY, NY 12205
Phone: 518-438-9907 • Fax: 518-438-9914

www.youngsommer.com

William A. Hurst, Esq.
Writer's Telephone Extension: 242
whurst@youngsommer.com

April 18, 2023

<u>**Via Registered Mail, Return Receipt Requested**</u>

Hon. Michael S. Regan
Administrator
U.S. Environmental Protection Agency
Office of the Administrator (1101A)
William Jefferson Clinton Federal Bldg.
1200 Pennsylvania Avenue, NW
Washington, DC 20460

> *RE:*   *60-Day Notice of Intent to Sue Town of Ticonderoga, NY for Failure to Comply*
> *with Mandatory Non-Discretionary Duties Under the Safe Drinking Water Act*

Dear Administrator Regan:

This letter provides notice that William Grinnell, Frank Sheldon and Daniel Blanchette Sr., as residents of the Town of Ticonderoga ("Ticonderoga" or the "Town") who are connected to and/or served by the Town's municipal water system and who on a daily basis consume drinking water the Town supplies to them at a cost, and/or who have recently been or are under imminent threat to be disconnected from such municipal water system, intend to commence a civil action against the Town, the New York State Department of Health ("DOH"), and the United States Environmental Protection Agency ("EPA"), pursuant to Section 1414(b) of the *Safe Drinking Water Act* ("SDWA"), 42 U.S.C. S§ 300g-3(b), 300j-8(a) and Section 5-1.30 of the New York State Sanitary Code, seeking monetary penalties for these violations as well as injunctive relief compelling Ticonderoga to come into compliance with the SDWA, its implementing regulations, and the New York State Sanitary Code.

The Town is an incorporated town formed under the laws of New York, and located in Essex County. The Town is a "municipality" within the meaning of Section 1401(10) of SDWA, 42 U.S.C § 300f(10). The Town is a "person" within the meaning of Section 1401(12) of SDWA, 42 U.S.C. § 300f(12).

## STATUTORY BACKGROUND

### *The Safe Drinking Water Act*

Section 1401(4) of the SDWA, 42 U.S.C. § 300f(4), and 40 C.F.R. § 141 2, define a "public water system" as a "system for the provision to the public of water for human consumption through pipes or other constructed conveyances, if such system has at least fifteen service connections or regularly serves at least twenty-five individuals." A "supplier of water" is defined at Section 1401(5) of the SDWA, 42 U .S.C. §300f(5), and 40 C.F.R. § 141.2, as "any person who owns or operates a public water system."

Public water systems must comply with the National Primary Drinking Water Regulations promulgated under Part B of the SDWA, 42 U.S.C. § 300g-300g-6, except to the extent that an exception, variance, or exemption under Section 1411, 1415, or 1416, 42 U .S.C. §§ 300g, 300g-4, or 300g-5, is applicable. SDWA Section 1411, 42. U.S.C. § 300g.

Section 300j-8(a) of the SDWA authorizes "any person" to commence a civil action "against any person" to compel compliance with applicable requirements of the SDWA and to obtain civil penalties for violations of applicable requirements of the SDWA.

### *The Enhanced Treatment Rule*

The National Primary Drinking Water Regulations include the Long Term 2 Enhanced Surface Water Treatment Rule, hereinafter "Enhanced Treatment Rule." 40 C.F.R. § 141.700(a). EPA promulgated the Enhanced Treatment Rule on January 5, 2006. See 71 Fed. Reg. 654 (January 5, 2006). The Enhanced Treatment Rule applies to public water systems supplied by a surface water source. 40 C.F.R. § 141.700(b).

EPA described the purpose of the Enhanced Treatment Rule at its publication:

EPA is promulgating the Long Term 2 Enhanced Surface Water Treatment Rule to further protect public health against *Cryptosporidium* and other microbial pathogens in drinking water. *Cryptosporidium* is a protozoan parasite that is common in surface water used as drinking water sources by public water systems. In drinking water, *Cryptosporidium* is a particular concern because it is highly resistant to chemical disinfectants like chlorine. When ingested, *Cryptosporidium* can cause acute gastrointestinal illness, which may be severe and sometimes fatal for people with weakened immune systems. *Cryptosporidium* has been identified as the cause of a number of waterborne disease outbreaks in the United States.

71 Fed. Reg. 654 (January 5, 2006) (parenthetical references omitted).

The Enhanced Treatment Rule requires public water systems that receive water from an unfiltered surface water source to provide at least 2-log Cryptosporidium inactivation, i.e., treatment that inactivates 99% of the existing number of Cryptosporidium bacteria, and potentially higher levels of inactivation depending on the current Cryptosporidium levels in the water source. 40 C.F.R. § 141.712. The Enhanced Treatment Rule requires unfiltered public

water systems serving fewer than 10,000 people to achieve the required Cryptosporidium treatment by October 1, 2014. 40 C.F.R. § 141.713. The Enhanced Treatment Rule also requires public water systems using uncovered finished water storage facilities to cover the water storage facility, or treat the water discharged from the uncovered finished water storage facility to the distribution system in order to achieve inactivation and/or removal of at least 4-log virus, 3-log Giardia lamblia, and 2-log Cryptosporidium by April 1, 2009, or to be in compliance with a state-approved schedule to meet these conditions no later than April 1, 2009. 40 C.F.R. § 141.714.

### *The New York Public Health Law*

New York Public Health Law § 1100 authorizes the New York Department of Health to promulgate regulations to protect public water supplies from contamination. New York Public Health Law § 1102 provides that if a public water system is in violation of regulations promulgated pursuant to § 1100, and the water system does not come into compliance after receiving notice of the violation, New York may file an action for penalties and an injunction restraining the public water system from further violations. New York Public Health Law § 1103 provides that a public health system in violation of regulations promulgated pursuant to § 1100 is subject to civil penalties of up $200 per violation, per day of violation.

### *The New York State Sanitary Code*

Pursuant to § 1100 of the New York Public Health Law, the Department of Health promulgated § 5-1.30 of the New York State Sanitary Code to establish treatment requirements for public water systems. The State Sanitary Code definition of public water system includes community water systems that provide water to the public for human consumption through pipes that serve at least 25 individuals daily at least 60 days out of the year. 10 NYCRR 5-l.l(be).

For public water systems using an unfiltered surface water source, as a condition of continuing to avoid filtering water provided to users, the State Sanitary Code requires disinfection sufficient to ensure at least 99.9 percent inactivation of Giardia lamblia cysts and 99.99 percent inactivation of viruses, between a point where the raw water is no longer subject to recontamination by surface water runoff and a point downstream before or at the first consumer. 10 NYCRR 5-1.30(c)(3).

For public water systems using an unfiltered surface water source, as a condition of continuing to avoid filtering water provided to users, the State Sanitary Code requires that the disinfection system have redundant components to ensure continuous disinfection, and requires that auxiliary power with automatic start and alarm is provided at all disinfection facilities where a power outage would result in a loss or reduction in the ability of the system to maintain the required disinfection concentration. 10 NYCRR 5-1.30(c)(4).

### *Filtration Avoidance Determination*

Public water systems must filter all water from a surface water source that is not subject to a current Filtration Avoidance Determination. 10 NYCRR 5-1.30(b). In 1991, New York granted Ticonderoga a Filtration Avoidance Determination for Gooseneck Pond, which allowed

Ticonderoga to distribute water from Gooseneck Pond to its users without filtering the water. One condition of the Filtration Avoidance Determination was that Ticonderoga install a redundant chlorination system at its Gooseneck Pond Chlorination Station. Another condition of the Filtration Avoidance Determination was that Ticonderoga evaluate its transmission system to ensure that users directly upstream from the Gooseneck Pond Chlorination Station were receiving water that had been exposed to the required chlorine contact time.

## GENERAL ALLEGATIONS

Ticonderoga operates a "public water system" within the meaning of Section 1401(4) of the SDWA, 42 U.S.C. § 300f(4), 40 C.F.R. § 141.2, and 10 NYCRR 5-l .l(be). Ticonderoga is a "supplier of water" within the meaning of Section 1401(5) of the SDWA, 42 U.S.C §300f(5), 40 C.F.R. § 141.2, and 10 NYCRR 5-1.1(bu). Ticonderoga must comply with all National Primary Drinking Water Regulations promulgated under Part B of the SDWA. None of the exceptions in Section 1411, 42 U.S.C. §300g are applicable.

Ticonderoga does not have a variance or exemption pursuant to Sections 1415 or 1416 of the SDWA, 42 U.S.C. §§ 300g-4 or 300g-5, for any part of its public water system. Ticonderoga's public water system serves more than 25 and less than 10,000 users.

At all times relevant to this Complaint, Gooseneck Pond was and is an unfiltered surface water source. Gooseneck Pond supplies water to Ticonderoga's public water system. From Gooseneck Pond, water flows through the Gooseneck Pond Chlorination Station, after which water is distributed to several users before being stored in the Chilson Reservoir. After the Chilson Reservoir, water passes through the Chilson Reservoir Chlorination Station, before being distributed to hundreds of users in the Town of Ticonderoga.

Ticonderoga was repeatedly notified of the violations at issue in this Complaint, including via communications from the State in 1991, 2009, 2011, 2013, and 2015, and communications from EPA in 2014 and 2015.

The senders of this correspondence notified Ticonderoga of treatment and other alternatives to solving the surface filtration problem at Gooseneck Pond. The Town has failed to engage these alternatives in any meaningful way.

### _Ticonderoga's Failure to Live Up to the Terms of its Settlement with USEPA and DOH_

In April of 2018, the United States of America (on EPA's behalf) and DOH commenced a civil action against the Town, ostensibly seeking to enforce the Enhanced Treatment Rule. *See United States, et al. v. Town of Ticonderoga*, NY, 18-cv-442 (GLS/CFH) (NDNY 2018) [Dkt. 1]. Just three months later, in July 2018, the parties to the EPA enforcement action entered into a Consent Decree, for the ostensible purpose of resolving the Town's chronic SDWA violations on a certain timetable. (*See*, *id*., ¶ 11(a)).

To date, entry into that Consent Decree has been completely ineffective at resolving the Town's violations of the SDWA, and neither EPA nor DOH is actively enforcing its requirements. The Town remains in violation of the Enhanced Treatment Rule.

On December 19, 2022, the Town notified certain residents that the Town would soon discontinue their existing municipal water supplies, largely sourced from Gooseneck Pond. In exchange, the Town intends to move some, but not all, current users to a system served by a recently developed well-field. But this new well-field the Town developed to move Ticonderoga residents off surface water sources is nearly a complete failure. A report by AES Northeast dated June 8, 2021, reveals a nearly irremediable hard water condition, and admits that the drinking water the Town intends to and does now supply to some residents, is almost literally "off the charts" for hardness, a highly corrosive and undesirable condition for any water system, much less the very water residents drink to live.

By shifting to these new, deficient wells, the Town is creating other potentially unmanageable environmental and socio-economic impacts. The Town is a small community with a modest publicly-owned treatment works. Even apart from the solid waste impacts of most hard water treatment by-products, the Town POTW cannot handle the massive influx of hard water, even treated, over any long term. The Town itself lacks the funding to maintain and repair the POTW under these circumstances. And even if it could, it is discharging the remnants of that wastewater into Lake Champlain, thereby literally "downstreaming" the problem to a drinking water source for thousands of other upstate New Yorkers who rely on that water body.

Noticeably absent from the record seems to be any real plan by the Town to mitigate or eliminate these adverse impacts, or their costs to taxpayers. The SDWA demands more to ensure compliance with its terms. The solutions considered under the Consent Decree are insufficient, in adequate, and will do more harm to public health and drinking water supply than any other available alternative. Under these circumstances, residents are justifiably concerned that they too will be subjected to this unsafe and harmful product being delivered by the Town into their homes. They do not want hard water; they do not want to purchase and install or ingest water softener systems or products; they do not want to be faced with the prospect of discoloration, corrosion and deterioration of pipes and fixtures. The Town must do better for its residents. The SDWA demands as much.

EPA and DOH have a mandatory duty to ensure that the Town does so, and that it complies with the SDWA. They have breached that duty. They have failed to enforce the Consent Decree or to protect public health. To comply with the SDWA, the Town, EPA, and DOH must revisit the entire plan to comply with the Enhanced Treatment Rule.

### _Name and Address of the Person(s) Giving Notice_

As required by 40 CFR § 135.12(b), the name, address, and telephone number of the person(s) giving notice is as follows:

Mr. William Grinnell
17 Grace Avenue
Ticonderoga, NY 12883

Mr. Frank Sheldon
58 Cossey St.
Ticonderoga, NY 12883

Mr. Daniel Blanchette Sr.
134 Old Chilson Rd.
Ticonderoga, NY 12883

As required by 40 CFR § 135.12(c), the name, address, and telephone number of the legal counsel representing the above is as follows:

William A. Hurst, of Counsel
Young / Sommer, LLC
Five Palisades Drive, Suite 300
Albany, New York 12205
(518) 438-99107
(518) 438-9914
whurst@youngsommer.com

Please do not hesitate to contact the undersigned should you wish to discuss this matter further.

Respectfully submitted,

YOUNG / SOMMER LLC

William A. Hurst

cc:    ***All via Certified Mail, Return Receipt Requested***

Hon. Merrick Garland, Attorney General
U.S. Department of Justice
950 Pennsylvania Ave., NW
Washington, DC 20530

Regional Administrator Lisa F. Garcia
USEPA Region 2
Ted Weiss Federal Bldg.
290 Broadway
New York, New York 10007

James V. McDonald, MD, MPH
Commissioner
NYS Department of Health
Corning Tower
Empire State Plaza
Albany, New York 12237

William Grinnell
17 Grace Avenue
Ticonderoga, NY 12883

Mr. Frank Sheldon
58 Cossey St.
Ticonderoga, NY 12883

Mr. Daniel Blanchette Sr.
134 Old Chilson Rd.
Ticonderoga, NY 12883

Mark A. Wright, Supervisor
Town of Ticonderoga
PO Box 471
Ticonderoga, NY 12883

# EXHIBIT 3

# Town of Ticonderoga



Mark A. Wright
*Supervisor*
(518) 585-6265
Fax (518) 585-3279

Tonya M. Thompson
*Town Clerk*
(518) 585-6677
Fax (518) 585-7211

132 Montcalm Street, P.O. Box 471, Ticonderoga, NY  12883  -  TDD 711

<u>Town Council</u>
Dave Woods
Joyce Cooper

<u>Town Council</u>
Tom Thatcher
Tom Cunningham

December 19th, 2022

Stephanie Frazier
2595 NYS RTE 74
TICONDEROGA, NY 12883

Re:     Drinking Water Supply for Current Chilson-Eagle Lake Drinking Water Users
           2591 NYS Route 74
           138.15-1-11.000

Dear Fellow Residents:

As you are aware, The Town of Ticonderoga entered into Consent Decree with the US Department of Justice on July 11, 2018. Pursuant to the Consent Decree, the Gooseneck Pond drinking water source that currently supplies water to the users of the Chilson and Eagle Lake areas will be discontinued indefinitely as of June 24, 2025. To comply with this deadline, the Gooseneck Pond water source will likely be discontinued at the latest, summer or fall of 2024. The Town of Ticonderoga has been working diligently alongside the Town's engineers for many years to find a solution to provide public water to the users of the Chilson and Eagle Lake areas following the discontinued use of Gooseneck Pond.

Town staff and the Town's Engineers have performed both a desktop and field study of the parcels in the Chilson and Eagle Lake areas. The studies were used to collect additional information pertaining to potential drinking water sources for each individual parcel. Based on separation distances from potential sources of contamination, the Town and their Engineers have developed possible options for each parcel in the Chilson and Eagle Lake areas. Options evaluated include drilling a private well, withdrawing surface water from Eagle Lake to be treated by an in-home treatment system for use, drilling a common well shared amongst no more than four homes, or being connected to either the existing municipal system or a new smaller municipal system using a well as a source.

Based on the results of the studies performed. **your parcel may be suited for a common well shared amongst no more than four homes.**

Please understand that this letter is ONLY meant to provide homeowners with what is believed to be a potential option for their parcel. It is ultimately your decision as the property owner to implement the water source which you feel best fits your needs. Thus, this information is intended to be informational ONLY, and not a determination by the Town or its Engineers as to a specific water supply for your property.

Enclosed, please find informational flyers relative to all options. These flyers provide information on each source, treatment systems and their components, permitting, regulatory requirements, existing source decommissioning, and pertinent contact information.

Lastly, the Town continues to seek funding to assist homeowners with private drinking water sources. To date the Town has not secured funding in this regard, but significant efforts will continue.

This is an Equal Opportunity Program.  Discrimination is prohibited by Federal Law.  Complaints of discrimination may be filed with USDA, Director, Office of Civil Rights, Room 326-W, Whitten Bldg., 1400 Independence Ave, SW, Washington, DC 20250-9410